MONCCTRF, P.
This case has been argued with signal ability by the counsel on both sides. All the points discussed are interesting, but many of them are immaterial to the decision of the case, in my view of it, and will not, therefore, be considered. Without intending to decide, I will assume, *534 for the purposes of the case, that the first executions which issued on the judgments referred to in the proceedings were, in fact, levied, as stated in the returns on said executions; that the auditor had authority by law to control the said executions, and ' to stay proceedings *thereon, even after they were levied; and that the effect of his act in staying such proceedings, either by itself or in connection with the act of the attorney-general, and the act of the General Assembly, passed February 22, 1867, entitled “an act for the- relief of J. M. Walker and others, securities of C, W. Watkins, sergeant of Danville,” (Sess. Acts, ch. 229, p. 664,) was.to discharge the property levied on from the said executions. And upon that assumption I will proceed to consider — Whether the sureties, who were the owners of said property, did not, in fact, consent to the act or acts by which it was discharged as aforesaid, and to the discharge itself; and if so, whether the new executions issued upon said judgments were not lawfully and properly issued, notwithstanding there may have been no such consent on the part of the principal debtor.
First. Did the sureties consent? That all of them did, except Withers, seem to me to be very clear. All of thém, at least with that exception only, as soon as the executions were levied, or about to be levied, on their propert3r, earnestly appeal to the authorities at Richmond for indulgence, which was accordingly granted to them, without any other consideration or motive than pure benevolence. Such was the urgency of the pressure upon them; the sheriff having levied upon the goods of the first set of sureties — Walker, Keen and Withers — and being about to advertise them; that two of said sureties, Walker and Keen, made their first application for indulgence by telegraphic dispatch to a brother of one of them in Richmond, Colonel E. F. Keen, a member of the Legislature, then in session; and the answer came promptly back, in the same way, in a direction to the sheriff, first from the attorney-general, and then from the auditor, to stay proceedings on the executions then in the hands of said sheriff. A few days thereafter the sheriff received the execution against Watkins ■ *a.nd his second set of sureties — -Han-kins, Graves and Keen — and levied it on the property of said sureties, who thereupon had a meeting, and agreed that Han-kins should apply in person to the auditor for indulgence on the said execution, which was accordingly done; and on the 16th of February, two days after the said levy, the sheriff received a dispatch from the auditor staying proceedings oil said last mentioned execution. And six days thereafter, to-wit: on the 22d of February, an act of the Legislature was passed for the relief of all the sureties, releasing the damages recovered against them, amounting to twelve or fifteen hundred dollars, on condition of the payment of principal, interest and costs by the 1st of August, 1867. After the . passage of the act, Walker informed the sheriff that he had gotten indulgence to the 1st of August, and the first thing the sheriff knew of the passage of the act was that he saw a manuscript cop3r of it in the hands of Walker and Keen, sent to them by Colonel E- F. Keen. The sheriff expressly says that Walker and Keen approved of and ratified the said indulgence. But that all of the sureties approved of and ratified it is conclusively proved in the record. How, then, can it be said that they did not consent to it? It is argued, that they only asked for, and consented to, a sta3’’ of the proceedings, and not a discharge of the levy. But this is certainly not so. Their conduct and declarations, and the thing itself in its very nature, conclusively prove that this is not so. The sheriff expressl3r proves that Keen and Walker not only claimed that the act operated as an indulgence till the 1st of August, but sought a release of their property from the levy, and claimed that the proceedings did operate as a release of said levy, which effect was produced, as they contended, by the suspension of the auditor and attorney-general, and the act of assembly aforesaid. And the sheriff took the same view of the subject, and acted accordingly. *A11 of the sureties knew that the sheriff took this view of the subject, and acted upon it; and all of them either expressly insisted on the same view, or acquiesced in it by continuing to use and enjoy their property which had been levied on, or dispose of it at pleasure, without regard to the levy, and inconsistently therewith. No surety made any objection to the delay of proceedings or consequential discharge of the levy, and none at any time required that the sheriff should proceed to sell under the executions any of the property that had been levied on. Each of them took the full benefit of the indulgence,-and accorded it to his co-sureties. The nature of the most of the property levied on, and the business of some of the parties, was such as to require the property to be discharged from the levy as a consequence of the suspension of the proceedings. Walker was a merchant, in full and active operation, with a large stock of goods in his store, all of which were levied on. His business could not go on without a release of the levy. So important did he, and even the sheriff, consider it that his mercantile operations should not be suspended for a moment, that those operations continued to go on even while the parties were applying for indulgence by telegraphic dispatch. In asking for indulgence, therefore, Walker asked for a release of his merchandise from the levy as the chief object he had in view. The sheriff told Keen and Walker,, after the . indulgence was given by the auditor, that he would not do any thing further until the indulgence was at an end; and Walker told him he expected to have his part of the money ready: Have it ready, no doubt, by means of his mercantile operations. Keen and Withers were producers, and Keen a manufacturer of tobacco. Their tobacco had been levied on in the leaf; and it was nec *535 essary, as well for the preservation of the subject as to provide the means of paying-off the judgments, that the tobacco levied on should *be prepared for sale, and carried to market and sold. And this was accordingly done by the parties themselves. It surely cannot be necessary to say anything more to show the consent of all the sureties, except Withers, to the discharge of the levy.
And now as to Withers. A good deal has already been said incidentally, tending to show his consent also; but what remains to be said will, I think, make his consent almost as clear as that of his co-sureties. He was not in Danville when the executions were levied and the application for indulgence was made by his co-sureties ; but was at his home in southwestern Virginia. He had a farm and crop of tobacco in Pittsyl-vania, on which tobacco the executions in which he was a defendant were levied. His overseer was informed of the levy at the time it was made, and no doubt promptly informed him of it. He knew that the judgments had been obtained, for he had been duly notified of the motions, and must have known that executions would soon be out against him. He knew that his principal Watkins was insolvent, and that the burden of the judgments would have to be shouldered by the sureties. It was natural that the sureties should confer together as to the best means of meeting the difficulty and bearing the burden, and they doubtless did so confer. That an appeal to the public authorities was spoken of and contemplated by them in their conferences is very probable. The executions, came out and were promptly levied when he was far away; and of course he could not actively join in the measures, at once from necessity used, to prevent a forced sale and sacrifice of the property of the sureties. There can not be a doubt that he would have so joined had he been present. It was his manifest interest to do so, and his.conduct and declarations afterwards prove that he would. Being absent, his associates applied for him and them, and obtained indulgence for both. The appeal must *have been presented to the auditor, attorney-general and legislature in behalf of all the sureties, and relief was accordingly granted to all. The order given by the attorney-general and auditor was, generally, to stay the executions. And the act of the legislature was for the relief of the sureties generally. It is impossible to believe that this general indulgence would have been given had it been imagined by those who gave it that the boon was not desired by all who were intended to be benefited by it. Keen and Walker certainly intended to make the application on behalf of all. They did not expect or desire that their property should be discharged, and not that of their associate Withers. They, therefore, applied for the indulgence in general terms, believing it would be as acceptable to Withers as it certainly was to them. To grant the indulgence in the terms in which it was asked would be to discharge the levy as to Withers as well as themselves. They surely did not mean, by asking the indulgence, to discharge Withers, and shoulder his part of the burden as well as their own. They must, therefore, have intended to act for Withers, either because he had authorized them, or because they knew or believed that he would sanction it. And now let us en-quire whether it does not appear, by what he afterwards said and did, that he either authorized it beforehand, or at least after-wards sanctioned it. Withers, though not present when the executions were levied and the applications for indulgence were made, yet came to Pittsylvania very soon thereafter, and before the passage of the act of the legislature; having come over, as he said, for the purpose of meeting the executions like a man, and making some arrangement to pay them. On that occasion, he said'to the sheriff that he was very glad the indulgence had been granted, and expressed the hope that something might be made out of the assets of Watkins (the principal) to alleviate the liability. The sheriff judged *from Withers’ conversation that he had been to Danville, and heard of the indulgence. Now where it will be remarked, that the proceedings to obtain the desired indulgence to all the sureties were not then completed, but were still in course of execution. The act of assembly, which was expected to give indulgence to the 1st of August, had not then been passed, but its probable passage was no doubt communicated to Withers by his associates. Did he object to what had been done, or protest against what was about to be done, either to his associates, or to the sheriff, or to the auditor, or to the legislature, or to any person whatever? Not a word of any such thing is to be found in the record, where it would certainly have been if it had existed. On the contrary, what he said to the sheriff shows that he approved and sanctioned what had been done and was doing in his behalf, and ‘ ‘was very glad the indulgence had been granted, ’ ’ not only because it was an indulgence to his associates, but especially because it was an indulgence to himself. And he “expressed the hope that something might be made out of the assets of Watkins to alleviate the liability” — that is, the liability of the sureties, himself in the number, thus admitting that their liability was to continue, and was only to be alleviated by means of the indulgence. We see, in this expression of Withers, a common object between him and his co-sureties, thus showing that they had conferred together and concurred in regard to one of the benefits to be expected from the indulgence. A similar expression was made by Keen and Walker, when they claimed to the sheriff that they had received an indulgence till the 1st of August, 1867, “by which time they hoped that Watkins would settle up his business, and that they would realize something from that source.” And Withers accepted, and has enjoyed, the full benefit *536 of the indulgence thus granted to him and his associates. Instead of his tobacco being sold in the *leaf, in his barns in the country, at a forced sheriff’s sale, he has had the advantage of preparing it for - sale and carrying it to the best market, and selling it for the best price. And in May or June, 1867, we find him speaking to the sheriff of the fine price he had gotten for his crop of tobacco — the very crop on which the execution had been levied, by the discharge of which levy he had been enabled to obtain such a price. It thus appears, from all the circumstances of the case, that Withers either previously authorized his associates, Keen and Walker, to apply for the indulgence which was granted to him and them, or sanctioned the application after it had been ■ made, and even before it had been fully granted, and accepted and has enjoyed the benefit of the indulgence. And in either view it may be said, that he as much consented as did the other sureties to the indulgence which was given,' and the effect of it (if it had that effect) in discharging the levy of the first executions. And now I proceed to en-quire,
Secondly. Were the new executions which were issued upon the judgments lawfully and properly issued, notwithstanding there may have been no such consent on the part of the principal debtor. If all the defendants, principal as well as sureties, had consented to the discharge of the first levy, it is abundantly proved ■ by the authorities, and indeed admitted on- all hands, that it would have been no bar to new executions. It is not pretended that there was any new contract which satisfied the judgments or tied the hands of the commonwealth, even for an instant; but there was simply a voluntary release of the levy, and if all the defendants had consented to such release, there would have been no question in the case. All the sureties did consent, and -there is no evidence whether the principal, who is the only remaining defendant, consented or not. If he had been consulted, he would no doubt have ^consented to that or any other courts which his sureties might have thought would be a benefit to them, or which they might have desired to pursue. He was insolvent, and really had no interest in the subject. The executions were not levied on his property, for he had none, but only on the property of the sureties. And they, and all others concerned, doubtless thought it wholly unnecessary to consult him as to whether his- sureties should be indulged or not in the payment of his debt. His consent might fairly be presumed and inferred in the case, if it could be affected by such consent. lie is not here complaining. He made no motion to quash the new executions, and of course did not join in this appeal from the judgment overruling the motion of the sureties.
We might, therefore, properly stop at this point. But let' us proceed further, and treat him as-not having given his consent. And then how does the matter stand?
The learned counsel for the plaintiffs in error contend, that though the sureties may have consented to the indulgence which released the levy upon their property; though such indulgence may have been granted only at their request and for their benefit; though they may have received and enjoyed the full benefit of the indulgence ; and though they may be in no danger of sustaining any loss by reason of it; yet, because their insolvent principal did not also consent (though there is no evidence whatever of his dissent) they are, by reason of such indulgence and its effect, forever released from the debt! And not only so, but that the principal debtor himself is thereby released from the debt, and must go quit thereof forever I The counsel maintain that this strange effect is produced by a technical, unbending rule of law, that when the plaintiff in an execution against several defendants which has been levied on sufficient personal property, voluntarily discharges the levy without the consent of all the defendants *he thereby releases such of the defendants as do not consent to such discharge; and that a release of one or more of several joint, or joint and several debtors, is a release of all. They-maintain that the rule applies to this case, and therefore, that the discharge of the levy on the property of the sureties, (though at their request,) without the consent of the insolvent principal, (supposing that he did not _ consent,) was a release of the principal, and that a release of the principal was, by operation of law, a release of the sureties also. Now if there be such a technical, unbending rule of law, and it applies to this case, we will have to be governed by it, unjust and unreasonable as its operation would certainly be. But surely a rule of law which would lead to such consequences ought to be well and firmly established by authority before we are required to follow it. Is there such a rule of law? I think not.
It has been often said by judges, in general terms, that a levy of an execution on personal property sufficient to discharge it is a satisfaction of the judgment; but this is certainly not so. Clerk v. Withers, 2 Ld. Raym. R. 1072, is the source from which the expression seems to have been derived; and though there majr be dicta to that effect in the opinions of some of the judges who decided that case, there is certainly nothing in the decision itself which gives any warrant to the expression. Nobody can find any fault with .that decision. A sheriff had levied an execution in favor of an administrator on the property of the defendant, and before the sale of the property the plaintiff died. The defendant then sued the sheriff for his property, upon the ground that the death of the plaintiff put an end to further proceedings on the execution. But the court held, that the sheriff was bound to go on and make the sale, and pay the money into court, according to the mandate of the writ. This case is fully reviewed and commented upon in the opinions of the judges in Giles *537 v. Grover, 6 Bligh’s *R. 277, decided in 1832, in which the effect of a levy, and the nature of the lien thereby acquired, are subjects of much observation. All the cases show that the mere levy of the execution on property of the defendant is not satisfaction of the judgment, but only a step towards it. A levy on property is not the object of the execution, but payment of the money. The levy does not divest the defendant of the property and transfer the title to the plaintiff, or even to the sheriff. The property still remains in the defendant, notwithstanding the levy, and only a special interest is vested in the sheriff, as a mere bailee, to enable him to keep the property safely, and defend it against wrongdoers. While subject to the levy it is in the custody of the law, and the sheriff has a naked power to sell it and pass the title from the owner to the purchaser. Several successive steps are to be taken between the issuing of the execution and the satisfaction of the judgment. The first step is, to place the execution in the hands of the sheriff. The effect of this step is, to make it a lien on the property of the defendant to a certain extent and of a certain character. The nature of this lien is commented on and explained in Humphrey v. Hitt, 6 Gratt. 509, as well as elsewhere. It is of so imperfect a nature as that the plaintiff may abandon it at pleasure by withdrawing his execution from the hands of the sheriff, or directing him not to levy it, wihout discharging the judgment, or even affecting the liability of a surety who may be one of several defendants. Id. and the cases therein cited of McKenney v. Waller, 1 Heigh 434, and Alcock v. Hill, 4 Id. 622. The second step is, to levy the execution on specific property, by which such property is set apart from the general property of the defendant and placed in the custody of the law until it can be sold and applied to the payment of the execution. The third and last step is, the sale of the property. Then, and not till then, the plaintiff *may be said to have gotten to the end of his suit, at least so far as the defendant is concerned, and to the extent of the value of the property, unless indeed the property be lost by the neglect or misconduct of the sheriff, without the defendant’s consent; in which case also the plaintiff may be said to have gotten to the end of his suit. Now until this last step is taken, the thing remains in fieri, and may, in a certain manner and under certain circumstances, be so undone as that the plaintiff may be placed in the same situation in which he was before he sued out execution, and may therefore sue out a new execution. But by taking the second step, to wit: the levying of the execution, the plaintiff increases his responsibilities and makes it more difficult to withdraw the execution without endangering the debt. He has thereby acquired a specific and a better lien ; still not perfect, but yet so nearly so, as that he cannot always safely release it of his own accord. He then becomes, as has j been said, a trustee of the execution for the benefit of all parties concerned. The defendant is interested; because a specific portion of his property having been seized and placed in the custody of the law for the payment of the execution, he has a right to be protected against another seizure under a new execution for the same debt, without his consent, or unless there be a necessity for it. The sureties, if there be any, of the defendant on whose property the levy is made, are also interested, in having the property of their principal, thus specifically bound for the payment of that debt, applied to that purpose, in their exoneration in whole or in part, according to the value of the property. They also, therefore, have a right to be consulted by the plaintiff in giving up the lev}', and must consent thereto in order to make them liable to a new execution; at least without having credit for the amount of the first levy. Until the plaintiff “has gotten to the end of his suit;” in other words, until *he has gotten satisfaction of his demand, or what is equivalent thereto, he may continue to prosecute his remedy to judgment and sue out execution after execution thereon; taking care not to oppress or injure the defendant or his sureties, if there be any. The court in which the judgment is rendered has ample power to superintend and control the execution of process thereon, and will take care to prevent its being perverted to purposes of injustice or oppression. A plaintiff, therefore, may always, with the consent of the defendants, abandon a levy upon the property of all or any of them, and sue out a new execution. If the defendants be a principal and his sureties, and the property levied on be that of the sureties, the plaintiff may, with the consent of the sureties only, abandon the levy and sue out a new execution against all the defendants. No injury is done to the principal by releasing the lien on the property of the sureties, for that lien cannot enure to his benefit in any possible event. If his sureties are satisfied, he, certainly, has no cause to complain. So also if the levy be abandoned by the sheriff' with the consent of the defendant, without the concurrence or authority of the plaintiff; or, if the property be by the defendant eloigned or removed out of the reach of the sheriff, without the consent either of him or the plaintiff, the latter may sue out a new execution. But if the property levied on be lost to the defendant by the misconduct or neglect of the sheriff, the execution is thereby satisfied to the extent of the value of the property, and the plaintiff can then look only to the sheriff for indemnity. The reason of this is plain. The plaintiff, by pursuing his remedy, has caused the defendant’s property to be taken out of his hands and placed in the custody of the law for the satisfaction of the debt. If that property be lost by the default of the officer of the law, who in this respect may be said to be the agent of the plaintiff, and without the consent of the de *538 fendant, *it is reasonable and proper that the loss should not fall on the defendant, and he be +hus, to that extent, compelled- to pay' the debt twice. .The plaintiff must incur the risk of ultimate loss in this respect, as the result of an inherent defect of his legal remedy.
These principles seem to be fully sustained by the cases, especially the most recent; among which are Green v. Burke, 23 Wend. R. 496; Ostrander v. Walter, 2 Hill’s N. Y. R. 329; Taylor v. Ranney, 4 Id. 619; The People v. Hopson, 1 Denio’s R. 574; Peck v. Tiffany, 2 Comst. R. 451; United States v. Dashiel, 3 Wall. U. S. R. 688. In The People v. Hopson, the court, Bronson, Ch. J., said: ‘‘If the broad ground has not yet been taken, it is time it should be asserted, that a mere levy upon sufficient personal property, without anything more, never amounts to a -satisfaction of the judgment. So long as the property remains in legal custody, the other remedies of the creditor will be suspended. He cannot have a new execution,” &c. “But without something more than a mere levy, the judgment is not extinguished. There is no foundation in reason for a different rule. The mere levy neither gives anything to the creditor, nor takes anything from the debtor. It does not divest a title: it only creates a lien on the property. It often happens that the levy is overreached by some other lien, is abandoned for the benefit of the debtor, or defeated by his misconduct. In such cases there is no color for saying that the judgment is gone; and yet they are included in the notion that a levy satisfies the debt.” “The true rule I take to be this: the judgment is satisfied when the execution has been so used as to change the title, or in some other way deprive the debtor of his property. This includes the case of a levy and sale; and also the case of a loss or destruction of the goods after they have been taken out of the debtor’s possession by .virtue of the process. When- the property *is lost to the debtor in consequence of the legal measures which the creditor has pursued, the debt is gone, although the creditor may not have been paid. He must take his remedy against the officer, if he has been in fault; and if there be no such remedy, the creditor must bear the loss. But until the debt is paid, or the debtor has lost his property in consequence of his levy, the judgment remains in force.” In Peck v. Tiffany, the court,' Hoyt, J.; clearly states in effect the same doctrine thus-: “There are some old cases in which dicta are found that a levy upon sufficient property to satisfy an execution, is a satisfaction; but that doctrine has long since been exploded. When a sheriff levies upon sufficient property, and through his negligence or' misconduct it is lost, destroyed, or otherwise disposed of, so that the defendant is deprived of the benefit of it, there is no doubt it should be regarded as a satisfaction of the execution, and the plaintiff must in such case seek his remedy against the sheriff. But when the debtor has neither paid the debt, or been deprived of his property, the simple act of levying upon it is not satisfaction, whether the debtor has been permitted to retain the property either by his own misconduct or by his request, or .the voluntary act of the officer; because neither works any wrong to him. ’ ’ In the United States v. Dashiel, decided in 1865, the last case we have on this subject, it was decided that the levy of an execution, even if made on personal property sufficient to satisfy the execution, is not a satisfaction of the judgment, and accordingly, therefore, does not extinguish it, if the levy have been abandoned at the request of the debtor, or for his advantage; as for example, the better to enable him to find purchasers for his property. In the opinion of the court delivered by Justice Clifford, the rule is laid down in the same words in which it is laid down by Ch. J. Bronson as before mentioned, *which words were repeated. by the latter in Taylor v. Ranney, referred to by the former.
There is nothing in any case decided by this court, so far as I am aware, at all in conflict with the principle before stated. The decisions of this court which were relied on in the argument as having a bearing upon this subject, are cases in which sureties sought relief, generally by motions to quash executions on account of some act of the creditor done, as they supposed, in derogation of their rights; as by making a new contract with the principal debtor which tied the hands of the creditor, or by releasing the lien of a levy on the property of the principal debtor, without the consent of the sureties. In this case there was no contract between the creditor and debtor, principal or sureties, which tied the hands of the creditor for an instant; indeed, no contract at all between them, except that on which the judgments were obtained. The orders given by the attorney-general and auditor were founded on no valuable consideration, and were recoverable at pleasure, though that of the auditor was for a stay of proceedings for sixty days. And the act of assembly, as was properly conceded in the argument, merely' released the damages on condition of the payment of principal, interest and costs into the treasury on or before the 1st day of August, 1867, and did not gúve a moment’s stay of proceedings on the executions, or in any manner affect the levy thereof. And in addition to all this, as I think I have shown, the sureties not only consented to the said orders and act, but solicited and obtained them for their special relief and accommodation; the executions having been levied alone on their property, and their principal being insolvent. What analogy there can be between this case and the decisions of this court above referred to, and how any title to relief can be worked out by the sureties *or any of them on the authority of those decisions, or otherwise, upon the facts as I think I have conclusively shown them to be, I con *539 fess I cannot comprehend. If I am right as to the facts, J think I am certainly right in my conclusion. If the facts were different, I would have some interesting questions yet to consider, but as they are not, it is unnecessary to notice them. I intended to have reviewed at some length the cases of Baird v. Rice, 1 Call 18; Bullitt’s ex’ors v. Winstons, 1 Munf. 269; Steele v. Boyd, 6 Leigh 547; and Ward v. Vass, 7 Id. 135; but I do not think it necessary to do so, and the length of this opinion admonishes me of the propriety of drawing it to a close. Before I do so, however, I must notice one or two other matters.
I have thus far considered the case as if the Commonwealth, through her agents, had consented to and concurred with the sheriff and the smreties in the discharge of the levy. But such I think is not the fact. Evidently neither the attorney-general nor the auditor knew anything of the executions having been levied when they gave their orders of suspension. The question of levy or no levy was one of doubt upon the facts — at least as to some of the parties — and it does not appear that any of the facts were communicated to these officers of government. Indeed, it appears that even Keen and Walker were probably under the impression that no levy had been made when they applied by telegraphic dispatch to Richmond for indulgence; for the sheriff proves that they made no objection to the levy otherwise than they desired the levy delayed until they could hear the result of their application. But however that may be, the attorney-general and auditor, even if they knew when they gave their orders that the execirtions were levied, did not intend thereby to discharge the levy, but merely to suspend proceedings on the executions; and such is the true construction of their *acts. They did not direct the property to be restored to the possession of the defendants. A mere suspension of proceedings on a levied execution does not authorize a restoration of the property to the possession of the defendant, nor release the levy. Fisher v. Vanmeter, 9 Leigh 18. That the auditor did not intend to release the levy of the first execution is shown by the conversation which occurred between the sheriff and the auditor’s clerk, when the first executions were returned, from which it is obvious that the auditor expected the money to be made on the first executions if not paid on or before the 1st of August. That the act of assembly did not operate a discharge of the levy has already been shown. So that if this view be, as it seems, correct, the release of the levy in this case has resulted, not from any act or consent of the Commonwealth or her agents, but solely from a misconception by the sheriff and the sureties, of the meaning and effect of the orders of the attorney-general and auditor and act of assembly aforesaid, and from the consequent abandonment of the property by the sheriff, and conversion of it by the sureties to their own use. In this view of the case, the right of the Commonwealth to sue out the new executions, would, if possible, be still more manifest.
In regard to the last assignment of error, which was not relied on or noticed, if it was not in fact withdrawn, in the argument, to wit, that the judgments rendered against Walker, Keen and Withers at one time, and the judgments rendered against Watkins at another time, the first process not having been executed as to him, are not joint judgments against all the said parties, whereas the executions are against all the said parties jointly, and therefore do not pursue or correspond with the judgment. If that be any defect at all, it is only formal and not substantial, and has not injured, but rather benefited, the plaintiffs in error. I therefore think it is not a good ground for reversing *the judgment, especially as it does not appear that the objection was taken in the court below. The Commonwealth had a right to have her motion against the sureties continued until the notice was served on the principal, and then to take a joint judgment against all; or she had a right to take several judgments against the sureties and the principal, as they were respectively served with notice, as she did; and she might lawfully have sued out several executions on the judgments as they were obtained. But she chose to wait after getting judgments against the sureties until she had also gotten judgments against the principal in the joint proceedings against all, and then to sue out joint executions against all. I can see nothing objectionable in this, and certainly nothing of which the plaintiffs in error have any reason to complain.
In regard to the right of the Judge in vacation to give the sheriff leave to amend his returns; there can be no doubt, I think, but that he has that right, as incidental to the right expressly given him by the Code, chap. 187, | 23, to hear and decide on in vacation, a motion to quash an execution. A return on a former execution is generally very material evidence on the hearing of such a motion, and it is often important, in the course of the proceedings, to permit the sheriff to make or amend his return according to the truth of the case, and with a view to its effect upon the decision of the motion. Such permission has always been given by our courts. Bullitt’s ex’ors v. Winstons is an instance of this kind. When, therefore, the statute gave to the judge in vacation power to quash an execution, it gave him also, by implication, power to permit the sheriff to make or amend his return, as the case may be, on the former execution, and I think the Judge did not err in permitting the amendments in this case. But whether we look to the original or the amended returns, the result will not be varied. In either case, we '^must look also to all the facts of the case as contained in the record, and decide accordingly. Ward v. Vass, 7 Leigh 135. There is, indeed, no material conflict *540 between either of these two sets of returns and the other facts of the case.
I am of opinion that there is no erroi in the judgment, and that it ought to be affirmed.
The other judges concurred in the opinion of Moncure, P.
Judgment affirmed.